## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SAWYER BROS., INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:15-cv-338-NT |
| | ) | |
| M/V ISLAND TRANSPORTER, et al. | ) | |
| | ) | |
| Defendants. | ) | |

Based upon the evidence and arguments presented, I make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

**The Parties**

1. Ryan Sawyer and Ross Sawyer own Sawyer Brothers., Inc. ("**Sawyer Brothers**"), a concrete construction company based in Thomaston, Maine. The company works on the mainland and on the nearby islands.

2. Sawyer Brothers relies on a large truck with an attached crane to place heavy pieces of material and equipment. Before the accident, the company used a 1987 Mack truck. Mounted on the Mack was a 1992 Copma knuckleboom crane, which could extend 68 feet and lift 2,400 pounds. Four outriggers attached to the side of the truck provided extra stability. The Mack truck had Department of Transportation ("**DOT**") certification, and the crane was Occupational Safety and Health Administration ("**OSHA**") certified.

3.  Island Transporter, LLC ("**Island Transporter**"), a subsidiary of Rockland Marine Corporation, operates out of Rockland, Maine. Defs.' Ex. 7. Island Transporter owns and operates the passenger vessel the *M/V Island Transporter*. Defs.' Ex. 7.

4.  Because it is designed to run up onto a beach to load and discharge cargo, the *M/V Island Transporter* has a flat, steel hull like a barge or landing craft. Defs.' Ex. 8. This makes the *M/V Island Transporter* more susceptible to pitching in rough seas than a vessel like the Maine State Ferry, which has a hull curved like a "V" that slices through the water.

5.  The *M/V Island Transporter* is equipped with several D-rings on the deck that can hold chains to lash down vehicles. It takes approximately ten to fifteen minutes to lash down a vehicle.

6.  In December 2014, Sawyer Brothers had a job to set panels for a foundation on North Haven, an island in the Penobscot Bay. Sawyer Brothers contacted Island Transporter to secure transportation for themselves and their equipment.

7.  Sawyer Brothers previously had hired Island Transporter six to twelve times to take them to various island jobs over the years.

**The Route**

8.  The route from Rockland Harbor to North Haven Harbor crosses the southern end of the Penobscot Bay and takes approximately one hour. At its beginning and end, the route is protected by harbors and islands; the middle passage

crosses exposed, open water for approximately two to three miles. The open waters closer to Vinalhaven and North Haven can get especially rough.

**Understanding Weather and Sea Conditions on the Penobscot Bay**

9. Before deciding to carry through with a planned voyage, mariners typically check the National Oceanic and Atmospheric Administration ("**NOAA**") weather forecast and buoy data, available through television newscasts, smartphones, computers with internet access, and VHF radio.

   a. There are two relevant NOAA forecast areas: the ANZ 151 area, which covers Penobscot Bay (the "**Penobscot Bay forecast**,") and the ANZ 150 area, which runs from Stonington, Maine to Port Clyde, Maine out to 25 nautical miles (the "**Coastal Waters forecast**"). The route taken by the *M/V Island Transporter* falls entirely within the southwestern corner of the Penobscot Bay forecast area, but the route is only approximately two miles north of the border between the Penobscot Bay and the Coastal Waters forecast areas.

   b. The route is also proximate to West Penobscot Bay weather buoy F01 at Station 44033 ("**the F01 buoy**"). The F01 buoy is just on the Coastal Waters side of the boundary with the Penobscot Bay forecast area. The North Eastern Regional Association of Coastal Ocean Observing System ("**NERACOOS**") manages the F01 buoy, which collects and transmits actual weather and oceanic data, including wave height and frequency and wind speed and direction. Court Ex. 1. NERACOOS and NOAA publish the data approximately hourly online and on the radio.

3

c.  Weather and sea conditions do not stop exactly at the boundaries delineated in NOAA weather zone maps. Mariners take into account the conditions in neighboring weather zones to best anticipate conditions. The Plaintiffs' expert witness Captain Dinsmore said two weather reports for regions that border each other should be compiled. Captain Morse stated it is prudent to take more than one piece of information into account when making navigational decisions. Mate McIntyre described calculating the average between the Penobscot Bay and Coastal Waters forecast areas for the route to North Haven. Defendants' expert witness Captain Hight said to understand the conditions, he created a personal forecast based on the F01 buoy data and inshore and offshore forecasts. He said it's a mistake to rely on the Penobscot Bay forecast and not take into account the Coastal Waters forecast. Maine State Ferry Captain McNichol stated that for the route in question he would listen to both the Penobscot Bay and Coastal Waters forecasts but would really pay attention to the Coastal Waters forecast.

d.  The influence of the Coastal Waters conditions would decrease the further north the location in the Penobscot Bay.

10. Mariners analyze NOAA forecasts and buoy data according to generally understood guidelines.

a. Wave size is forecasted and measured by the significant wave height, which is an average of the highest one third of all waves.

4

b. An extreme wave is twice the height of the significant wave and may occur once every one thousand waves. Where the significant wave height is 2-4 feet, a mariner could reasonably anticipate an 8 foot extreme wave.

c. The term rogue wave is colloquially used to refer to an extreme wave, but technically a rogue wave is larger and occurs less frequently than an extreme wave.

d. When wind blows over a large exposed area of water, larger waves can build. Mariners refer to these lengths of water where seas build as "fetch." Because the Penobscot Bay is long north to south, and entirely open on the southern end, winds from the south can create a significant fetch.

**The Weather and Sea Conditions on December 11, 2014**

11. Gale warnings were in effect into the early morning hours of December 10, 2014 within the Penobscot Bay and the Coastal Waters forecast areas with gusts up to 30 knots. Pls.' Ex. 1.

12. By December 11, 2014 at 3:06 a.m., conditions had calmed down from the previous day, but NOAA noted a small craft advisory would be in effect through the afternoon in both the Penobscot Bay and Coastal Waters forecast areas. The NOAA forecast for the Penobscot Bay was seas 2-4 feet, a chance of drizzle, and southerly winds 10-20 knots, becoming 15-25 knots in the afternoon. The NOAA forecast for December 11, 2014 in the Coastal Waters area was

5

southerly winds at 20-25 knots with gusts up to 30, seas 8-11 feet, and a chance of drizzle. Pls.' Ex. 1.

13. NOAA did not issue another forecast until 2:30 p.m. on December 11, 2014. Pls.' Ex. 1.

14. While the NOAA forecasts provide predictions for the future, the F01 buoy provides hourly data averages for conditions actually occurring. On December 11, 2014 at 5:30 a.m., the F01 buoy recorded that the significant wave height was 5.3 feet, the wave period (the seconds between waves) was 10.7 seconds, wind direction was 174.2 degrees, wind speed was 16.1 knots, and the wind gust was 20.1 knots. At 7:30 a.m., wave height was 6.3 feet, wave period was 10.7 seconds, wind direction was 186.0 degrees, wind speed was 18.7 knots, and wind gust was 23 knots. Pls.' Ex. 2.

15. At 8:30 a.m., just before the *M/V Island Transporter* departed Rockland, the F01 buoy recorded that the wave height was 6.7 feet, the wave period was 5.3 seconds, the wind direction was 175.3 degrees, the wind speed was 18.5 knots, and the wind gust was 23.4 knots. By 9:00 a.m., the wave height decreased to 5.5 feet, but the wave period accelerated to 6.4 seconds. Winds were still southerly at 18.6 knots. Pls.' Ex. 2.

16. At 9:30 a.m., wave height at the F01 buoy swelled to 7.1 feet, and wave period accelerated to 5.3 seconds. Pls.' Ex. 2. It was around this time that the accident at issue occurred.

**Preparations for the December 11, 2014 Voyage**

17. Captain Richard Morse and Mate James McIntyre comprised the entire crew
assigned to the *M/V Island Transporter* for the December 11, 2014 voyage.
Captain Morse has a 100 ton near coastal captain's license. Defs.' Ex. 12. He
began working with Island Transporter in 2004, and, as of trial, had completed
3,002 trips with the company. As the captain of this voyage, Morse bore
responsibility for the vessel and all on board. Mate McIntyre has a 100 ton
inland waters captain's license and a 100 ton coastal waters mate's license.
Defs.' Ex. 11.

18. Captain David Whitney, the general manager of Island Transporter, has a
1600 ton ocean master's license, and he has navigated the *M/V Island
Transporter* himself several hundred times. Captain Whitney also has a habit
of checking the weather prior to an *M/V Island Transporter* voyage. He
testified he would not consider the Coastal Waters forecast because it is out of
zone of the route from Rockland to North Haven. When pressed, he said he
would not disregard the Coastal Waters forecast either because it is proximate.

19. Captain Whitney called Ryan Sawyer to cancel a voyage scheduled for a couple
of days before the December 11, 2014 trip, on account of bad weather.

20. On December 10, 2014, Captain Whitney talked with Captain Morse about the
weather forecast for the following day. They chose the morning of December
11th because it looked like a favorable weather window.

21. Captain Whitney called Ryan Sawyer on December 10th and left a voicemail
regarding the planned December 11th voyage. He said there may be showers

7

and asked if the Sawyers still wanted to go. Pls. Ex. 4. The Sawyers agreed to go.

22. Around 6:30 a.m. on December 11th, Captain Morse checked the weather from his home computer, referencing the NOAA forecast for Penobscot Bay, the website windfinder.com, and the local television weather report. Captain Morse chose to rely on the Penobscot Bay forecast and disregarded the Coastal Waters forecast as not relevant to conditions on his route. He knows of the F01 buoy, and testified that it was possible he checked that data because that is part of his normal habit. Captain Morse further asserted that where the weather forecasted 2-4 foot waves, the seas could potentially rise to 5-6 feet. He testified that it would not be prudent to make the voyage with reasonably anticipated 8 foot waves.

23. Mate McIntyre testified that if he were captain, he would not sail to North Haven with vehicles on board if the Coastal Waters forecast were for seas 8-11 feet because it would be a mess.

24. Captain Morse and Mate McIntyre came aboard the *M/V Island Transporter* at the Rockland Ferry Terminal at 7:15 a.m. Defs.' Ex. 1. Captain Morse did not have an internet connection, but he did have radio. After performing routine equipment checks and tests, they were underway at 8:15 a.m.

**Loading the Trucks and Passengers**

25. At 8:30 a.m., Captain Morse and Mate McIntyre arrived at Prock Marine in Rockland Harbor, where they planned to load the passengers and their three trucks. Defs.' Ex. 1. The three-man crew for Sawyer Brothers included Ryan

8

Sawyer, who drove the Mack truck, Ross Sawyer, who drove a pickup truck, and Dana Martin, who drove a loaded cement truck.

26. Mate McIntyre created the plan for arranging the trucks on deck. He considered the weight balance between the Mack truck and the heavier cement truck. These vehicles drove onto the vessel from a ramp at the bow of the *M/V Island Transporter* that was lowered onto the beach. The cement truck, driven by Dana Martin, backed in first and parked in the stern. Then, the pick-up driven by Ross Sawyer drove straight in, and parked in the middle under the pilot house. Last, the Mack truck, driven by Ryan Sawyer, backed on and parked in the bow.

27. The *M/V Island Transporter* was carrying the 65,200 pound cement truck, which is top-heavy and tall, and the 54,000 pound crane truck, but it was not overloaded beyond its weight capacity.

28. Mate McIntyre placed chocks at the trucks' wheels to impede the vehicles from shifting position on the deck, but he did not lash down the trucks to the D-rings on the deck of the *M/V Island Transporter*. Although Captain Morse had prior experience lashing down trucks when transiting in rough weather, he did not think the weather conditions merited this precaution and did not discuss the matter with Mate McIntyre or the passengers.

29. As a general practice, the Maine State Ferry places the vehicle that is the tallest and most top-heavy underneath the pilot house to help ensure that it does not tip over. The Maine State Ferry considers not transporting trucks

when there is a southerly wind. If the captain decides to transport trucks despite somewhat rough conditions, the practice is to lash them down. On December 11, 2014, the Maine State Ferry crossed the Penobscot Bay around the same time in the morning as the *M/V Island Transporter*. A truck onboard that ferry was lashed with chains through the D-rings on deck.

30. Neither Captain Morse nor Mate McIntyre asked the Sawyers to deploy the Mack truck's outriggers, and the Sawyers did not do so on their own initiative. Captain Morse previously had the outriggers of a truck deployed on a different voyage to add stability.

**Safety Briefing**

31. Neither Captain Morse nor Mate McIntyre provided a formal safety orientation to the passengers. The Sawyers and Martin testified that they were not told where to find life jackets at the start of the trip. Mate McIntyre testified that he had some conversation about whether the passengers wanted to stay in their trucks or stay in the passenger area where the life jackets were kept. Mate McIntyre acknowledged that he typically would not have had a discussion about the location of safety equipment with people who had previously been on the vessel, like the Sawyers. Although on cross-examination Mate McIntyre claimed that he thinks he specifically mentioned the life jackets, I find that it is not likely that he told the Sawyers where they could find life jackets before they got underway.

10

**Voyage Details**

32. The *M/V Island Transporter* departed Prock Marine at 8:50 a.m. en route to North Haven. Defs.' Ex. 1. Because Prock Marine is within the protection of Rockland Harbor, the waters there would not give the *M/V Island Transporter* crew visual notice of the sea conditions beyond the Rockland Harbor breakwater.

33. Rockland Harbor was merely choppy, but when the vessel passed the breakwater and entered open waters, it encountered rough seas. At that time, both Captain Morse and Mate McIntyre were up in the pilot house.

34. Martin testified that he had ridden the *M/V Island Transporter* several times a year for the past ten years and had never seen the conditions that rough before. The conditions were rougher than a prior occasion when the Maine State Ferry had lashed down his cement truck. He testified that after the vessel passed the breakwater, he was gripping his steering wheel and thinking that they should not have attempted the trip in those conditions.

35. Mate McIntyre agreed at trial that after passing the breakwater, the *M/V Island Transporter* could have turned into the Owl's Head Bay to lash down the trucks in more protected waters. The Defendants' expert testified that the Island Transporter practice was to turn into the wind and lash down vehicles if changing conditions made the precaution necessary.

36. The seas were increasingly rough, and seawater washed over the deck, displacing the wheel chocks. Ryan Sawyer got out of his truck to put them back in place. Ross Sawyer left his pickup and helped put the chocks back in place.

11

Ross Sawyer started looking for life jackets. He observed the right wheels of the Mack truck lifting up from the deck.

37. Seawater also splashed up over the bow and washed across the cement truck and the Mack truck's windshield, approximately five feet above the deck. Pls.' Exs. 5-10. Ryan Sawyer recorded videos of this on his cell phone from the driver's seat of the crane truck. Pls.' Exs. 5-10.

38. Around 9:30 a.m., the *M/V Island Transporter* was struck on its starboard side by a powerful wave. The impact caused the cement truck to tip over. Martin started honking the horn of the cement truck.

39. The shifted weight of the cement truck caused the vessel to list to port.

40. Thirty to sixty seconds later, a second wave hit the vessel's starboard side, causing the crane truck to tip over and land against the port bulwark. This caused the vessel to take on a more severe, thirty-seven degree port side list.

41. Captain Morse testified that the two waves that struck the *M/V Island Transporter* were 12-15 feet and were "completely different" from the otherwise "manageable" seas. Mate McIntyre, who was on the bridge with Captain Morse, testified that he did not see the waves that toppled the trucks. On December 16, 2014, Captain Whitney filed a report of marine casualty with the U.S. Coast Guard, which stated that the vessel encountered two waves that were each 10-12 feet, and the seas were generally 5-8 feet. Defs.' Ex. 8. The information in Captain Whitney's report was presumably provided by Captain Morse and Mate McIntyre. Captain McNichol, who was on the Maine State

Ferry heading from Vinalhaven to Rockland and about a mile away from the *M/V Island Transporter*, observed the trucks tip over. He testified that no "rogue" waves hit the *M/V Island Transporter*, and the seas were 6-7 feet.

42. When the *M/V Island Transporter* took on the severe list, Captain Morse contacted the Coast Guard for stand-by assistance in case the vessel rolled over. Captain McNichol was also concerned that the *M/V Island Transporter* might capsize.

43. Martin testified that after the cement truck tipped, waves washed over the truck, and he thought he would drown. Martin climbed out of the cement truck's driver's side door and dropped down to the deck. Martin sustained a cut on his arm. Once he was out of the truck, Martin's panic did not subside because he believed they were all about to fall into the ocean.

44. Ryan Sawyer was trapped in the Mack truck for several minutes. Standing on the interior of the driver's door, he managed to push open the passenger side door and climb out. He was afraid the truck would roll back onto all four wheels and crush him if he crawled down. He managed to jump down to the deck.

45. All of the passengers mustered on the starboard side of the vessel with Mate McIntyre and put on life jackets. Ross Sawyer was vomiting.

46. The Mack truck rocked and banged against the port bulwark.

47. Captain Morse was able to navigate the vessel to the protected waters of the Fox Island Thoroughfare and then to North Haven Harbor without further incident.

48. Captain Morse and Mate McIntyre passed the drug and alcohol testing that the Coast Guard requires after a marine casualty.

## Damage to Commercial Equipment

49. Sawyer Brothers, Inc. purchased their Mack truck in 2000 for $70,000. Defs.' Ex. 15.

50. The Sawyers kept this truck in immaculate condition. In 2013, the Plaintiffs spent $40,000 to refurbish the truck and rebuild the crane, during which time Ryan Sawyer visited the mechanic's shop daily to check on progress. The Sawyers and their mechanic established that after the repairs, the truck looked and ran like new.

51. After the incident, the estimated cost to repair the Mack truck and attached crane exceeded $140,000.

52. The Sawyer Brothers' insurance company, MiddleOak, determined that the cost of repair exceeded the value of the crane truck. MiddleOak paid Sawyer Brothers $80,000 to settle the claim.

53. The Sawyer Brothers had a hard time finding a replacement crane truck with a similar reach and weight capacity. Ryan Sawyer testified that because of the type of work they do, a replacement truck would need a crane with the same 68-foot reach that could lift at least a ton, front and rear axles that could support 44,000 pounds, a flatbed, and a headboard and footboard. Any less reach or weight capacity would make a significant difference in the utility of the crane truck because of the cost of moving and restabilizing the truck. The vehicle would also need to pass DOT inspection and receive OSHA certification.

14

54. The Defendants' appraiser, Christopher Rials, also had difficulty finding a comparable replacement truck in his effort to measure the Mack's fair market value. His guiding criteria were the make, model, and year of the truck with a knuckleboom crane. The most similar crane truck was the Plaintiffs' actual truck, which was being offered for sale at $39,500 by a dealer in Gray, Maine. But Rials testified that he did not realize that the truck had not yet been repaired.

55. Rials conceded that other than the actual vehicle, he could not find a comparable truck in Maine or the northeast region. Looking further afield, Rials found other crane trucks, but none with the same make, model, crane reach, and lifting capacity. Rials excluded from his analysis any crane trucks that could reach 68 feet or more because they were newer. So, the longest reach crane he took into account had a 63 foot reach. In addition, Rials stated that additional outriggers would add value, but he did not make note of outriggers on any comparable truck in his analysis of the Mack's fair market value. Rials also did not take DOT inspection or OSHA certification into account. Of the crane trucks that Rials did consider, those most similar to the Sawyer's crane truck were from 2004-2007 and had an average cost of $90,000. In addition, Rials reduced his appraisal value because of the age of Sawyer's Mack and his anticipation of maintenance costs. On this basis, Rials estimated the Mack truck's value at $38,000.

56. In February 2015, Sawyer Brothers purchased a 2006 Sterling crane truck with a 70 foot reach for $159,000. Pls.' Ex. 35. To fit their needs, they shortened the flatbed, painted the body, and put on eight new tires for an additional $7,350.00. Pls.' Exs. 25, 35. Ryan Sawyer traveled to Wisconsin to pick up and transport the truck back to Maine. The Plaintiffs request $3,000 for travel expenses but offered no evidence to support their claim. *See* Pls.' Post-Trial Br. 9 (ECF No. 89). They painted the crane at a cost of $3,958.50 and added company decals at a cost of $318.53. Pls.' Exs. 26, 27. The Maine sales tax, title, and registration added $9,477.00. Pls.' Exs. 28. State inspection and additional retrofitting cost $260.00. Pls.' Ex. 37. Hydraulic work on the crane cost an additional $495.00. Pls.' Ex. 38.

57. The Sterling truck only has two outriggers currently, whereas the Mack truck had four. The cost of two more second-hand outriggers would be $26,000, with $14,000 for the equipment and $12,000 for the installation.

58. In sum, the total replacement cost is $206,859.03.

59. The Sawyers do not view the Sterling as a better truck than the Mack truck.

60. The Plaintiffs claim additional damages for lost supplies. Approximately 80 percent of the 126 four-foot by two-foot panels on the truck were damaged. Pls.' Ex. 12g. Eight-foot panels cost approximately $118-$123 each, and Sawyer Brothers cuts these in half to make four foot panels. I find, based on this evidence, that the incident damaged approximately fifty eight-foot panels at an average cost of $120.50, for a total of $6,025. However, Sawyer Brothers

used some of its equipment at the North Haven job and subsequent jobs. Using damaged panels makes the finished wall rougher.

61. The Sawyers also lost several buckets of five inch waler clips that went overboard and cost approximately $8 each. The Plaintiffs did not make clear how many clips were lost.

**Lost Profits**

62. Sawyer Brothers did not rent a replacement truck because they could not afford the expense of a rental at $3,800 a month plus a $10,000 delivery fee.

63. The replacement Sterling truck was usable by mid-April, 2015.

64. In the period between the accident and the winter season when Sawyer Brothers generally does not work, the Plaintiffs performed some planned jobs without the truck in North Haven, Spruce Head, New Harbor, and Harpswell. Pls.' Ex 22. Labor took three to four times longer than it would have with a crane truck. In most instances, the additional labor was performed by Ross Sawyer and Ryan Sawyer, and in a few instances a third laborer joined them. The total cost incurred for the additional labor for these jobs was $9,000. Pls.' Ex 22.

65. In addition, Sawyer Brothers forfeited three planned jobs because, without the Mack, they were not able to keep the timeline that clients demanded. Ross Sawyer calculated $16,270 of lost profit and wages by deducting expenses from the estimate for each job. He also testified that Sawyer Brothers does not always get a job that it gives an estimate for, but he represented that these jobs were accepted and planned.

17

a. Sawyer Brothers gave an estimate of $21,910 to lay a foundation and build a basement floor and garage floor and walls in Brunswick. Pls.' Ex. 24. The estimate included the cost of materials the company would pay for, as well as labor and profit. In October 2014, Ross Sawyer wrote up a contract for the job, but the client never signed this contract. Defs.' Ex. 27. Ross Sawyer testified that they planned to do the job on January 12, 2015, but cancelled after December 11, 2014. Pls.' Ex. 22. The Plaintiffs claim $12,770 in lost profits and labor for this job. Pls.' Ex. 22.

b. In November 2014, Sawyer Brothers gave an estimate of $3,000 to lay a cement slab in Cushing. Pls.' Ex. 23. Ross Sawyer testified that they planned to do the job on December 22, 2014, but cancelled after December 11, 2014. The Plaintiffs claim $1,800 in lost profits and wages for this job. Pls.' Ex. 22.

c. Finally, the Sawyer Brothers claim to have given a verbal estimate of $3,000 to fill a hot tub in Augusta. The Plaintiffs claim $1,700 for this lost job. Pls. Ex. 22.

66. Sawyer Brothers presented scant evidence of additional "lost" jobs.

d. Sawyer Brothers previously had several contracts a year with Jim Leech at Bay Point Home, but have not had a contract since they filed this lawsuit.

18

e.  Sawyer Brothers declined a job in September 2015 on North Haven, citing the stress of transporting equipment to an island and logistical difficulty.

**Emotional Harm**

67. Ross Sawyer feared for his life on the *M/V Island Transporter*. He thought he would watch his brother die and then die himself without being able to say goodbye to his family. He thinks about the accident almost every day, particularly the memory of standing on the deck, thinking the vessel would tip him into the ocean. After the accident, he experienced ongoing nausea and stomach aches, pain in his chest and limbs, and decreased sex drive. He went on a cruise in February 2015 that had been planned before December 2014. While on board, he had a vivid nightmare of the ship sinking. He and his wife described his temperament as more irritable, anxious, and quick to rage. Both the Plaintiffs and the Defendants' experts found that Ross Sawyer could be diagnosed with PTSD because of the emotional trauma suffered on the *M/V Island Transporter*.

68. Ryan Sawyer feared for his life on the *M/V Island Transporter*. When the Mack tipped, he felt trapped inside the cab and thought that the truck would go over the bulwark into the sea. His escape from the cab was also scary—the door kept slamming shut as he tried to open it, and he thought the truck might roll back on top of him if he climbed down to the deck. Afterwards, he obsessively watched the video he had recorded when his truck tipped over. He kept thinking about that moment and what would have happened if the truck

had rolled into the water with him inside. He developed an outbreak of shingles, with a high fever and pain that felt like a heart attack. One of the known triggers of shingles is severe stress and emotional trauma. He also developed trouble sleeping, decreased appetite, anxiety, irritability, and a short-fuse temper. His wife testified that he was typically a patient person, but after the accident, he became so angry during a discussion about finances and finding a replacement truck that he punched the wall. This was behavior she had never seen before in their thirty-four years of marriage, and Ryan Sawyer expressed regret about the uncharacteristic outbreak. Both the Plaintiffs and the Defendants' experts agreed that the accident was an emotionally traumatic, anxiety-producing experience for Ryan Sawyer.

69. Although not a plaintiff in this case, Dana Martin's testimony about his emotional condition after the accident corroborated the traumatic nature of the experience. After December 11, 2014, Martin experienced flashbacks, met with a counselor, and took medication. The experience replays in his mind, and he copes now when the panic returns by getting out of his truck until he calms down. Two years later, he is still too traumatized by the experience to go on the *M/V Island Transporter*.

**Doris Nelson Scam**

70. Through friends, Ross Sawyer learned of an investment opportunity with a woman named Doris Nelson in Washington State. He invested in 2008 and encouraged his brother and father to invest also. Later that year, the investment was revealed to be a scam, and their investments were lost.

71. The Eastern District of Washington found in 2015 that the investor loss was $339,387.50 for Ross Sawyer and $153,056.68 for Ryan Sawyer and his wife.[1] Defs.' Ex. 22.

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Applicable Law

This Court has jurisdiction under 28 U.S.C. § 1333, which grants federal district courts jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." The relevant test is whether the cause of action "bear[s] a significant relationship to traditional maritime activity," and, in this case, admiralty jurisdiction is undisputed. *See Sisson v. Ruby*, 497 U.S. 358, 361 (1990).

Where admiralty jurisdiction has been established, federal maritime law applies. *Greenly v. Mariner Mgmt. Grp.*, 192 F.3d 22, 25-26 (1st Cir. 1999). The court may resort to state law only if it would not conflict with federal law or if maritime law is silent. *Id.*; *see also Fairest-Knight v. Marine World Distributors, Inc.*, 652 F.3d 94, 98 (1st Cir. 2011).

### II.    Negligence

I review the Plaintiffs' case under the principles of maritime negligence, but the elements are essentially the same as land-based common law negligence. *See Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409 (1953); *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 203 (D. Me. 2012). The plaintiff must establish by a preponderance of

---

[1]        I overrule the Plaintiffs' amended objection to Defendants' Exhibit 28, a document titled Order Re: Restitution and Order to Seal from the docket of *United States v. Doris Nelson*, 11-159-RHW (E.D. Wa. 2015). Pls. Amended Objection (ECF No. 79).

21

the evidence: (i) a duty owed by the defendant to conform his conduct to a certain standard to protect the plaintiff from unreasonable risk of harm; (ii) the breach of that duty; (iii) actual and proximate causation; and (iv) a loss or injury suffered by the plaintiff. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *Great Am. Ins. Co.*, 847 F. Supp. 2d at 203.

### A.    Duty and Breach

The duty of care arises from three sources in admiralty: "(1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence." THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 5-2 (5th ed. 2011). The owner of a vessel owes passengers a duty of "reasonable care under the circumstances" to prevent foreseeable harm. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).

Reasonable care includes a captain's "duty to monitor and take into account weather conditions." *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 748 (1st Cir. 1989). This same duty is essentially codified in the Code of Federal Regulations, which imposes a duty on the captain to pay "special attention . . . to . . . [p]revailing and forecasted visibility and environmental conditions, including wind and waves [and a] . . . . [v]essel's handling characteristics." 46 C.F.R. § 185.304. The evidence at trial also established a custom among reasonably prudent mariners who regularly traverse the southern portion of Penobscot Bay to consult the Coastal Waters forecast and the F01 buoy data, particularly when the winds are from the south.

22

In determining whether a duty has been breached, "a court must examine and weigh the probability of an accident, the potential extent of the injury, and the cost of adequate precautions." SCHOENBAUM, § 5-2; *see also Muratore v. M/S Scotia Prince*, 845 F.2d 347, 353 (1st Cir. 1988) (the degree of care taken must be "in proportion to the apparent risk").

### 1.    The Probability of an Accident Occurring

The evidence at trial of the forecasted and actual weather conditions and the vessel's handling characteristics established the high probability of an accident. First, although NOAA was forecasting waves of 2-4 feet for Penobscot Bay, Captains Dinsmore, Hight, McNichol, Morse, and McIntyre all agreed that a reasonable mariner in those waters would take into account other available information. Given that the winds were from the south, the Coastal Waters forecast became especially relevant for the crossing from Rockland to North Haven. NOAA predicted that the Coastal Waters forecast area would have seas of 8-11 feet. Because seas change gradually between forecast zones, the Coastal Waters forecast made it foreseeable that seas would be greater than predicted by the Penobscot Bay forecast at the southern part of the Penobscot Bay forecast area where Captain Morse would be traveling. Using an average between the Penobscot Bay and Coastal Waters forecasts, as Mate McIntyre indicated was his practice when serving as captain, seas between 5-7.5 feet could have been anticipated.

Second, the actual conditions made the risk of harm clear. At 6:30 a.m., when Captain Morse checked the weather on his home computer, he could have seen the 5:30 a.m. F01 buoy data, which measured the wave height at 5.1 feet. The data

further reflects that around the time of the accident, the wave height was 7.1 feet. Island Transporter's report, filed five days after the incident and presumably based on information from Captain Morse, indicated that seas were generally 5-8 feet.[2] Captain McNichol, who was in the same area at the time, estimated that the waves were 6-7 feet.

Third, the vessel was not up to the conditions. Captain Morse himself testified that it would not be prudent to take the *M/V Island Transporter* out into eight foot seas given her handling characteristics. The flat-bottomed boat was known to pitch more violently in rough water than a V-hulled ferry. Given that a reasonable mariner could have anticipated seas of 5-7.5 feet based on the forecasts, and given that the waves were actually running 5-8 feet beyond the breakwater, the probability of an accident was high.

### 2.    The Extent of the Harm Likely to Occur

The second consideration bearing on the issue of breach is the extent of the harm likely to occur. In this case, the fact that a very top-heavy cement truck was loaded onto the *M/V Island Transporter* is important. The testimony at trial was unanimous that once the cement truck tipped over, a complete capsize became a real

---

[2]     Captain Morse testified that his vessel was hit by two unpredictable 12-15 foot rogue waves in quick succession. I do not find Captain Morse's testimony credible for a number of reasons. First, in the report filed by Island Transporter, the waves that caused the trucks to tip were only estimated to be between 10-12 feet. Second, Captain Morse was the only one on board to have seen the rogue waves. Third, Captain McNichol, watching from approximately one mile away on the Maine State Ferry, testified that he saw no rogue waves hit the *M/V Island Transporter*. Fourth, in the video recorded by Ryan Sawyer, I see little difference between the waves that hit in the minutes before the accident and the waves that hit at the minute when the cement and crane trucks tipped over. Pls.' Ex. 7-8. Finally, as Kenneth McKinley, the meteorological expert testified, in 8 foot seas, a wave would have to be 16 feet to be considered an extreme wave and even greater to be a rogue wave.

possibility. When the crane truck also tipped, the vessel took on a 37 degree port-side list. Although the vessel made it to North Haven without further incident, even Captain Morse acknowledged his concern about capsizing. If the port bulwark had given way or if another large wave had hit, the vessel could have capsized and the results could have been catastrophic.

### 3.   The Reasonableness of Precautionary Measures

The third consideration bearing on the issue of breach is the reasonableness of precautionary measures in light of the foreseeable risk. *Muratore*, 845 F.2d at 353. Lashing down a vehicle is a low-cost precaution; it takes approximately ten to fifteen minutes, and the *M/V Island Transporter* was equipped with D-rings for that purpose. The Defendants' expert testified that ferries do not lash down vehicles, but that morning, the Maine State Ferry implemented this precaution and lashed down a truck that it carried across the Penobscot Bay. Particularly with a top heavy vehicle like the cement truck that may tip and cause a significant weight shift, it was important to make sure the vehicle was secure.

A captain should not be insulated from liability where the decision to sail is reasonable at the outset, but the conditions worsen during the course of the voyage, and there is still time to take precautions or turn back. When the *M/V Island Transporter* was in Rockland Harbor, Captain Morse could not see what the conditions were like beyond the breakwater, and perhaps the failure to lash at that point did not violate the standard of care. But once he was in open water, it was obvious that the seas were rougher than he anticipated.

25

Mate McIntyre acknowledged that the lashing could have occurred once the vessel reached the open water. The Sawyers both testified that the wheel chocks kept slipping out from under the tires of the vehicles. The chocks were clearly not up to the task of stabilizing the vehicles. Captain Morse could have turned into Owl's Head Bay and secured the vehicles there, or he could have turned into the wind and secured the vehicles as he had done in the past.

I find that failure to take the protective measure of lashing down the vehicles given the size of the waves past the breakwater was clearly negligent. Given the availability of information that would have informed Captain Morse of the likelihood of rough weather in the open water; given the probability that the seas were too rough for a vessel with the handling characteristics of the *M/V Island Transporter* particularly while transporting an unsecured and top-heavy cement mixer; given the potential for catastrophic harm to the occupants; and given that the simple precaution of lashing the vehicles would have drastically mitigated the risk of harm, I find that Captain Morse breached his duty of care to those on board the *M/V Island Transporter*.

### B.    Causation and Harm

The Defendants' negligence actually and proximately caused the Plaintiffs harm. Specifically, the Defendants' negligence caused the loss of their crane truck, the profits of several jobs, and emotional distress, described in detail below.

The purpose of damages is to make the plaintiff whole by compensating for the injuries or losses actually and proximately caused by the defendant's negligence.

Damages must be tailored to place the aggrieved party in as good a position as he would have been in if the accident had not occurred. *Pinto v. M/S Fernwood*, 507 F.2d 1327, 1331 (1st Cir. 1974); *Great Lakes Bus. Trust v. M/T Orange Sun*, 855 F. Supp. 2d 131, 149 (S.D.N.Y. 2012); *see also* SCHOENBAUM, § 5-16. Damages must be reduced to the extent that the Defendants prove contributory negligence or a failure to mitigate. *Pennzoil Producing Co. v. Offshore Express, Inc.* 943 F.2d 1465, 1474-75 (5th Cir. 1991); *The Great Northern*, 251 F. 826, 830 (9th Cir. 1918); *Rev-Lyn Contracting Co. v. Patriot Marine, LLC*, 760 F. Supp. 2d 162, 169 (D. Mass. 2010).

I award the Plaintiffs a total of $260,186.03 in damages. I award $134,916.03 for lost property, $25,270 for lost use and profits, and $100,000 for emotional distress. I conclude that the Defendants have not established contributory negligence or failure to mitigate that would reduce this award.

### 1.    Lost Equipment

The Defendants' negligence caused the loss of the Plaintiffs' Mack truck, which was damaged as it rolled with the waves onto its side and banged against the port bulwark. Supplies onboard the truck were also lost or damaged. Lost property damages should put the injured party in "as good [a] position pecuniarily as if his property had not been destroyed." *Standard Oil Co. of New Jersey v. S. Pac. Co.*, 268 U.S. 146, 155 (1925).

Where the property is deemed a constructive total loss, the general standard for assessing damages is its fair market value, reduced by any salvage value. *DiMillo*, 870 F.2d at 751. A "constructive total loss occurs when the cost of repairing the

27

[property] is greater than its fair market value immediately before the casualty." *Id.* The best evidence of fair market value is the price obtained for similar vessels on the open market at the time of the damage. *Texas Co. v. R. O'Brien & Co.*, 242 F.2d 526, 527 (1st Cir. 1957). There are instances, however, where the fair market value cannot be "reasonably established," such as where no market exists for the lost property. *See Rev-Lyn Contracting Co.*, 760 F. Supp. 2d at 168; *McConchie v. Samsung Elecs. Am., Inc.*, No. 99-40, 2000 WL 1507442, at *2 (D.N.H. July 18, 2000).

Where fair market value cannot be readily established, courts employ a more flexible standard. Courts must make "a reasonable judgment having its basis in a proper consideration of all relevant facts." *Standard Oil Co. of New Jersey*, 268 U.S. at 156; *see also Greer v. United States*, 505 F.2d 90, 93 (5th Cir. 1974) ("[t]he court should consider any and all evidence before it to establish a fair valuation."). This analysis is guided by the principal of making the plaintiff whole and may take several forms. Courts "may rely upon the cost of the vessel to the owner," adding the cost of owner modifications and deducting depreciation. *Miller v. United States*, 614 F. Supp. 948, 956 (D. Me. 1985). Alternatively, courts may look to the value of the property to the owner. *See* Restatement (Second) of Torts §§ 911 (defining the value of lost chattel as either the "exchange value" (in the market) or the "value to the owner if this is greater than the exchange value"). Other courts have determined that the property's replacement cost is the proper measure. *See Greer*, 505 F.2d at 93; *Oliver J. Olson & Co. v. Am. S.S. Marine Leopard*, 356 F.2d 728, 733 (9th Cir. 1966); *McConchie*, 2000 WL 1507442, at *3; SCHOENBAUM, § 5-16 (covering "reasonable expenses").

28

The parties agree that the Mack truck was a constructive total loss. They differ, however, on how to measure the value of the truck at the time of the loss. I find that a fair market value of the Mack truck cannot be reasonably established in this case.

Christopher Rials, the Defendants' expert, sought to demonstrate the fair market value through contemporaneous sales, but the only truck he found in Maine with similar specifications was the Plaintiffs' own significantly broken Mack. By setting the fair market value of the Plaintiffs' Mack truck at $1,500 less than the asking price in its post-accident, unrepaired state, Rials seriously discredited himself. Ryan Sawyer credibly testified that he could not have used the damaged crane and that it would never have received OSHA certification. Rials conceded that other than the Plaintiffs' damaged Mack truck, he could not find a comparable truck in Maine or the northeast region. He did not take into account any trucks with a 68 foot or longer reach, and the longest reach crane in his "comparables" had only a 63 foot reach. Rials chose the model year as the most significant factor in assessing comparable crane trucks. But based on the Mack truck's recent refurbishment and its like new condition, I do not agree that the model year was that significant.

The Plaintiffs sought a replacement that met the unique specifications of the Mack, first locally and then nationally, without success. The most important specifications to the Plaintiffs were the crane's 68 foot reach and capacity to lift more than one ton. Sawyer Brothers has built its business around these precise specifications for the past fifteen years. The 68 foot reach allowed the Sawyer brothers to drop off and pick up the heavy foundation panels on most building sites

without having to engage in the time-consuming task of resetting and restabilizing the crane. The Plaintiffs also wanted a truck that, like the Mack, had a flatbed with a headboard and footboard to hold the cages of equipment. A truck that could pass DOT inspection and a crane that was OSHA certified were essential. These truck and crane specifications were necessary to the Sawyer Brothers' business.

When they realized that they were not going to be able to find a crane truck that met all of their requirements, Sawyer Brothers ultimately resorted to transporting the 2006 Sterling crane truck from Wisconsin and adjusting it to meet their specifications at a cost of $206,859.03. Because a fair market value of the Mack truck cannot be reasonably established in this case, this replacement cost is the proper measure of the value of the unique Mack.

Replacement costs should be reduced to avoid a windfall to the injured party. *See, e.g., McConchie*, 2000 WL 1507442, at *3 (decreasing the award where the replacement property was new and the lost property was worn). The Defendants argue that the Sterling truck is a windfall for the Plaintiffs because it is approximately twenty years newer than the Mack. Defs.' Post-Trial Br. 12 (ECF No. 84). The Plaintiffs credibly testified that the Mack truck was more valuable to them than the Sterling because of Mack's reputation and their truck's customized, pristine condition. The replacement costs incurred were reasonable to return the Plaintiffs to their condition before the Defendants' negligence. Accordingly, I find that a reduction from replacement costs based on windfall would be inappropriate here.

The Defendants also argue that the Plaintiffs are not the real party in interest to recover for the lost truck. Defs.' Post-Trial Br. 9-10. Federal Rule of Civil Procedure 17 requires that an action be brought in the name of the real party in interest, *i.e.* "the person for whose benefit the action is brought." Fed. R. Civ. P. 17(a). An insurer that has paid a part of the loss, including in instances where the loss exceeds the insurance coverage, is only a partial subrogee to the rights of the insured. 6A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FED. PRAC. & PROC. CIV. § 1546 (3d ed.). The partial subrogee insurer "may intervene in the action to protect its pro rata share of the potential recovery. If either [the partial subrogee or the subrogor] sues and the other does not voluntarily join or intervene, defendant may protect himself from multiple lawsuits by having the absent party joined." *Gannett v. Pettegrow*, 224 F.R.D. 293, 294 (D. Me. 2004). In this case, the Plaintiffs received $80,000 from their insurance company and asked that the Court reduce this amount from the award of their recovery costs. Because I find that the value of the Mack exceeded $80,000, the Plaintiffs remain the parties in interest for $126,859.03 in truck recovery costs.

In addition, the Plaintiffs have established some of their claim to lost supplies. The panels and clips are generic, and so fair market value, reduced by any salvage value, is the best standard for assessing damages. *See DiMillo*, 870 F.2d at 751. The Plaintiffs established $6,025 in damage to the panels, but I reduce this award by $1,000 to account for the continued use of some of the damaged panels. In addition,

the Plaintiffs established the $8 unit price for waler clips, but failed to satisfy their burden with regard to the number of clips that fell overboard.

Finally, the Defendants have not established contributory negligence or a failure to mitigate that would have reduced the Plaintiffs' property damages. Accordingly, I award $126,859.03 for the Mack truck and $5,025 for the lost panels and clips, for a total of $131,884.03 in lost property damages.

## 2.    Lost profits

Lost profits are available under maritime law where they are established to a "reasonable certainty." *Boudreau v. S/V Shere Khan C*, 27 F. Supp. 2d 72, 81 (D. Me. 1998); *Domar Ocean Transp., Ltd. v. Indep. Refining Co.*, 783 F.2d 1185 (5th Cir. 1986); *see also* Restatement (Second) Torts § 927 cmt. o (damages from the loss of use of destroyed chattel is compensable where "the plaintiff is unable promptly to find a replacement for the chattel on the market and is deprived of use during the period of delay. The loss of that use is not made good by a subsequent purchase and it is therefore compensable."). This standard does not require mathematical precision— "reasonable approximations will suffice." *Great Lakes Bus. Trust*, 855 F. Supp. 2d at 149.

The Defendants argue that lost profits are unavailable under the maritime constructive loss doctrine. This doctrine "discourages an owner from repairing a vessel that can be replaced for less money than the repair would cost, and will not permit an owner to recover lost profits when he or she should have expeditiously purchased a substitute vessel and continued the vessel's profit making activities."

32

*Sailor Inc. F/V v. City of Rockland*, 324 F. Supp. 2d 197, 200 (D. Me. 2004). The constructive loss doctrine does not apply to these facts. The Sawyers chose not to repair the Mack truck and crane because they considered the vehicle "totaled."[3] Ryan Sawyer started a diligent quest to find a replacement truck almost immediately after the accident. The Plaintiffs should not be punished for the fact that there were no similar trucks available for purchase. The evidence established that the Plaintiffs expeditiously purchased and retrofitted a replacement truck to fit the company's requirements, and continued the crane truck's profit making activities with all deliberate speed.

Plaintiffs are entitled to $9,000 loss of use damages for the additional hours of labor they expended to complete jobs immediately following the accident. In addition, the Plaintiffs are entitled to $16,270 for the lost earnings and profits from the three forfeited jobs that they could not perform without the truck. The Plaintiffs credibly presented their own estimates and testimony regarding their calculation of revenues, costs, and lost profits. The reasonable certainty of this claim is bolstered by its narrowness. The Plaintiffs assert they had only these three additional jobs lined up before they shut down for the winter season. Although the Plaintiffs did not provide corroborating contract evidence, I find that such a level of proof is not required. The

---

[3]     The parties do not dispute that the crane truck was totaled. Interestingly, the cost of the replacement crane truck turned out to be more than the estimated cost of repairs. There was no evidence offered as to the length of time it would have taken to repair the crane truck, and so it is impossible to determine whether the economically efficient decision would have been to repair the crane truck or replace it. In any event, at the time the Sawyers made the decision to find a new truck, they would not have been aware that it ultimately might have been less expensive to repair the original crane truck.

33

totality of the evidence establishes these forfeited earnings and profits with reasonable certainty.

Finally, I find that the Plaintiffs are not entitled to damages for "lost" jobs after the winter season. Both the decline in business with Bay Point Homes and Sawyer Brothers' reluctance to work on North Haven arose after the replacement Sterling truck was "up and running" and so are speculative and too attenuated from the loss of the Mack truck. I deny the Plaintiffs' claim for these "lost" jobs.

Regarding mitigation, the Defendants argue that the Plaintiffs failed to rent a replacement truck immediately, which could have allowed them to continue to work. Defs.' Post-Trial Br. 14. However, the expense and delivery time for a rental would not have been reasonable for the jobs forfeited immediately after the accident. Accordingly, I do not reduce these damages for failure to mitigate and award $25,270 in lost profit and use damages.

### 3.   Emotional Distress

Maritime law recognizes a claim for negligent infliction of emotional distress. The law allows recovery for those who satisfy the "zone of danger" test, that is, those who sustain a physical impact or are placed in immediate risk of physical harm. *Nieto-Vincenty v. Valledor*, 22 F. Supp. 3d 153, 160 (D.P.R. 2014) (applying the zone of danger test under maritime law, relying on *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 547-48, 554 (1994)); *see also Brennan v. Casco Bay Island Transit Dist.*, No. 07-138, 2009 WL 1307875, at *7 (D. Me. May 11, 2009) (same);

34

*Douville v. Casco Bay Island Transit District*, 1998 A.M.C. 2775, at *2782 (D.N.H. 1998) (same).

The Plaintiffs have established that the Defendants' negligence caused them emotional distress. They believed that the vessel was going to capsize or the trucks were going to roll over the bulwark into the ocean. Ryan Sawyer thought he would be crushed by the weight of his own truck when he climbed out of the passenger door and jumped to the deck of the *M/V Island Transporter*. Additional testimony from those nearby reinforced that the Sawyers were within the zone of danger: both Captain Morse and Captain McNichol called the Coast Guard because they believed the *M/V Island Transporter* could capsize. Both the Plaintiffs and Defendants' experts confirmed that this fear for their lives constituted a trauma for Ross Sawyer and Ryan Sawyer.

In some jurisdictions, to prevail on a claim of emotional injury that is independent of any alleged physical injury, the plaintiff must also demonstrate a physical manifestation of the distress. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1338 (11th Cir. 2012); SCHOENBAUM, § 5-16; *but see Stacy v. Rederiet Otto Danielsen, A.S.*, 609 F.3d 1033, 1035 (9th Cir. 2010) ("[The plaintiff] alleged that he was within the zone of danger and that he suffered emotional distress from the fright caused by the negligent action of the defendants. Nothing more was required to assert a cause of action cognizable under maritime law.").

The First Circuit has not ruled on this physical manifestation question, and district courts have reached different conclusions on the issue. *See Brennan*, 2009 WL

1307875, at *8 (holding that the plaintiff was not in the zone of danger, and so it would be "unnecessary to consider whether [he] must also show a physical manifestation of his alleged emotional injury in order to recover"); *but see Douville*, 1998 WL 35166841, at *2782 (considering the question of a physical manifestation requirement and deciding to apply it). Non-contradictory state law may fill gaps in maritime law. *Fairest-Knight*, 652 F.3d at 98. And in Maine, recovery for emotional distress does not require a physical manifestation. *Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433, 436-37 (Me. 1982) (finding the physical manifestation requirement to be overinclusive, underinclusive, and distortive of pleadings and testimony).

In this case, the Plaintiffs do not argue that the physical manifestation requirement should not apply, perhaps because they believe that they have established physical manifestations for both Ryan and Ross Sawyer. I agree. Ross Sawyer experienced manifestations of his emotional distress in the form of ongoing gastrointestinal distress and pain in his limbs. Ryan Sawyer had an outbreak of shingles. Accordingly, I find that both Ross Sawyer and Ryan Sawyer established physical manifestations, and I award each $50,000 for their emotional distress.

## III.  Prejudgment Interest

Prejudgment interest ensures that an injured party is fully compensated for the loss of the use of funds and "should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *City of Milwaukee*

36

*v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195-96 (1995). Finding no exceptional circumstances, I order the payment of prejudgment interest as permitted by law.

## CONCLUSION

For the reasons stated above, I find Island Transporter negligent and award a total of $257,154.03 in damages. I award $131,884.03 for lost property, $25,270 for lost profits, and $100,000 for emotional distress. Because this decision reaches the merits of the Defendants' arguments in their motions for judgment on the partial findings and for judgment as a matter of law, (ECF Nos. 73, 85, 86, 87), I now **DENY** those motions.

In addition, I **OVERRULE** the Plaintiffs' objection to the Defendants' Exhibit 28, a document titled Order Re: Restitution and Order to Seal from the docket of *United States v. Doris Nelson*, 11-159-RHW (E.D. Wa. 2015). Pls.' Amended Objection (ECF No. 79).

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 3rd day of November, 2016.